Louis and Kate Lerner, et al. [1] v. Commissioner. Lerner v. Commissioner
Docket Nos. 94694, 95263, 1037-62, 1111-62, 1263-62, 1284-62, 1296-62, 1407-62, 1408-62, 1460-62, 1554-62 1685-62, 1687-62, 1713-62, 2224-62, 3628-62.
United States Tax Court
T.C. Memo 1965-267; 1965 Tax Ct. Memo LEXIS 63; 24 T.C.M. (CCH) 1450; T.C.M. (RIA) 65267; October 5, 1965
*63 1. Held, that petitioners' incomes from tips as waiters were properly determined by the respondent through use of a formula based upon data obtained from the records of the petitioners' employer and through respondent's city-wide investigation of tipping practices in the New York City area, where such waiters either did not keep or did not make available to the respondent or to this Court, any records of their tip incomes for the taxable years. Barry Meneguzzo, 43 T.C. 824, follwed. 2. Held, that all petitioners except Anton Pollack (Docket No. 1037-62), are liable for additions to tax for negligence under section 6653(a) for each of the years involved. Barry Meneguzzo, supra, followed. Sol Charles Levine, for the petitioners in all docket numbers, except Leo Lepold, pro se, in Docket No. 1685-62, and Nicholas Delegianis, pro se, in Docket No. 1687-62. Arnold Y. Kapiloff, for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined deficiencies in the income taxes of the petitioners, and additions to tax for negligence under section 6653(a) of the 1954 Code, as follows: Addition to
Taxable
tax under
Docket No.
Petitioner
year
Deficiency
Sec. 6653(a)
94694
Louis and Kate Lerner
1957
$437.15
$21.86
1958
574.74
28.74
1959
510.55
25.53
95263
Emil and Elsie Lowy
1957
404.23
20.21
1958
503.11
25.16
1959
474.08
23.70
1037-62
Anton and Goldie Pollak
1957
429.48
21.47
1958
261.72
13.09
1959
400.11
20.00
1111-62
William Hoffman
1957
371.94
18.60
1958
283.00
14.15
1959
571.96
28.60
1263-62
Ben and Dorothy Marcus
1957
444.09
22.20
1958
492.83
24.64
1959
484.86
24.24
1284-62
Costas Xikis
1957
529.70
26.49
Costas Xikis and Kiki Xikis
1958
569.04
28.45
1959
737.89
36.89
1296-62
Emil and Marie Holzer
1957
373.22
18.67
1958
430.80
21.54
1959
537.91
26.90
1407-62
George and Greta Sahlin
1957
561.36
28.07
1958
721.80
36.09
1959
746.31
37.32
1408-62
Ralph and Filomena Marino
1957
406.91
20.35
1958
401.10
20.06
1959
355.63
17.78
1460-62
Frank and Ruth Ritter
1957
628.88
31.44
1958
607.40
30.37
1959
576.85
28.84
1554-62
Estate of Michael Reismann, Deceased,
1957
278.22
13.91
Helen Reismann, Administratrix
1958
384.86
19.24
1959
455.67
22.78
1685-62
Leo Lepold
1957
352.96
17.65
1958
373.37
18.67
1687-62
Nicholas Delegianis and Evangeline
1957
564.02
28.20
Delegianis
1958
541.75
27.09
1713-62
Louis Rannou
1957
547.70
27.39
1958
620.39
31.02
1959
641.02
32.05
2224-62
Raymond Desserre (Individually)
1957
530.54
26.53
Raymond and Lydia Desserre (Jointly)
1958
603.96
30.20
1959
543.93
27.19
3628-62
Allen Marcus
1957
579.35
28.97
1958
678.78
33.94
1959
714.92
35.75
*64 In the Marino case (Docket No. 1408-62), respondent also determined that the petitioners were liable for an addition to tax under section 6651(a) for failure to file a return for the year 1959 on the date prescribed therefor; but in his brief he conceded that such addition to tax was inapplicable. All these cases were consolidated for trial. The issues for decision are: (1) What is the correct amount of tip income that each of the petitioners (referring only to the husband-petitioners in those cases where joint returns were filed) received as a waiter for each of the taxable years? [2]
(2) Whether the petitioner in each case is liable for an addition to tax imposed under section 6653(a) of the 1954 Code for negligence or intentional disregard of rules and regulations, for each of the taxable years. Findings of Fact Some of the facts were stipulated. The stipulation of facts and all exhibits therein identified are incorporated herein by reference. *65 The returns for the taxable years in all of these consolidated cases were filed either with the district director of internal revenue, Manhattan District, or with the district director of the Brooklyn District. The issues in these cases relate only to the male petitioners. The term "petitioners" as used hereinafter will have reference to the husband-petitioners in those cases where joint returns were filed. During the years involved, each of the petitioners were employed as a waiter at Famous Ronnie's Inc., a restaurant doing business under the name of Ronnie's Steak House which was located on West 52nd Street, in New York City. (We shall hereinafter sometimes refer to this restaurant as "Ronnie's.") Ronnie's had been opened in 1950 by an individual named Joseph Heller. In 1955, Heller sold the restaurant to an individual named Isaac Malester who operated it as a sole proprietor until July 1, 1957, when it was incorporated. Malester and members of his family were also the owners of or stockholders in three or four other restaurants in New York City. Ronnie's was closed on May 19, 1962. During the taxable years, Ronnie's was a high grade, better than average restaurant. From 11 a.m. *66 to 3 p.m., lunch was served, at which a customer could get a complete meal - main course, dessert and coffee - for a price ranging from 95 cents to $1.15. From 5 p.m. until closing time, only a la carte meals were served. The speciality of the house was steak, which ranged in price from $5.95 to $6.50. Roast beef was also available a la carte for $5.95. If a customer desired a soup appetizer, he paid separately therefor; and the price was 50 cents. Beverages were likewise separately priced; and coffee was 40 cents per cup. Ronnie's had a bar where alcoholic beverages were served; and such beverages were also available to customers at their tables. Ronnie's employed between 16 and 18 waiters during the taxable years involved. Each waiter was assigned to a particular "station," composed of 4 or 5 tables, with from 2 to 6 seats at each table. Each waiter was responsible for taking the order from the members of the party at each table in his station; bringing the food and beverages to the table; and preparing a check (or bill) for the food and beverages purchased. Each waiter was also responsible for collecting from the customers whom he had served. There were three methods of payments *67 available to the customers during the years involved: (1) by cash; (2) by use of a charge account with Ronnie's; and (3) by use of one of the familiar credit cards (such as American Express, Diners' Club, and Carte Blanche). Tipping (or the giving of a gratuity to the waiter) was entirely voluntary with the customers, and there was nothing on the printed menu indicating that customers were expected to tip. However in most but not all instances, the customers did give the waiters tips. In the cash transactions, tips were paid in cash; and in the house charge account and credit card transactions, the tips might be paid in cash or they might be added to the bill. Where tips were added to the bill, they were generally greater than where they were paid in cash. Tips, expressed as a percentage of sales, also were generally larger at dinner and supper in the evenings, than they were at lunch served in the middle of the day. The cashier at Ronnie's gave to each waiter immediately, any tip that had been added to his customer's check. Each of the waiters in Ronnie's was from time to time called on to write checks for carry-out orders. The waiters received no tips on these transactions. Up to *68 sometime in 1958, each waiter at Ronnie's kept the station assigned to him, on a permanent basis. However, in that year business at Ronnie's began to decline, with the result that the waiters at some of the stations in less attractive parts of the restaurant were not getting an equal share of the customers. To correct this situation, in 1958 a system of rotation of waiters among the several stations in the restaurant was inaugurated and the system continued throughout 1959. Under this rotation system, each waiter was able to obtain a fair share of customers to serve. All of the petitioners were members of a union. Each petitioner was paid a regular salary each week which was based on the terms of a collective bargaining contract between Ronnie's and the union and which was based on the number of hours he actually worked during the week. The following are the wages provided for in said contracts between Ronnie's and the union, during the years involved: Year ending
Nov. 1
Weekly wage
1957
$33.50
1958
35.00
1959
35.00
Months of Nov.
and Dec. 1959
36.00 Another provision in the union contracts provided that on "prearranged affairs" (such as banquets), Ronnie's was to guarantee the waiters a minimum *69 of 15 percent of the total check in lieu of the "usual voluntary gratuity" given by customers to waiters. Ronnie's did not maintain any record, as such, of the tips received by its waiters. As to the tips which the waiters received in cash from customers, the amounts thereof were known only to the particular customers who gave them and to the particular waiters who received them. Ronnie's did, however, preserve the sales checks covering sales to customers, for at least 3 years; and by examination thereof, it was possible to ascertain the amounts of tips that had been added to the bills where customers charged the cost of their meals or used a credit card. Also, Ronnie's did not maintain a record showing a break down, by waiters, of its sales. None of the petitioners (with the exception of Anton Pollak) maintained any record of the tips which he received during the taxable years. Pollak did maintain records throughout the years involved. Pollak noted on a perforated stub that he detached from each check, the amount of the tip that he received with respect to the meal served. Sometime early in 1958 while Pollak was ill and confined in a hospital, his wife accidentally destroyed all of *70 these records that Pollak had accumulated up to that time. Each of the petitioners reported on his return for each of the years involved, the regular salary which he received as a waiter at Ronnie's; and there is no dispute in these cases as to the salary incomes. Each of the petitioners also reported an amount on his return for tips received as a waiter at Ronnie's. Such reported amounts of tips (including those reported by the above-mentioned petitioner Pollak) were based on estimates that were arrived at by the petitioners whose methods generally were to first estimate their total living expenses for the year, then deduct therefrom their regular salaries, and attribute the balance to income from tips. In or about 1959 or 1960, the respondent's agents in the New York City area undertook an extensive investigation of the reporting of tips for Federal income tax purposes by waiters in that area. In due course, the returns of the petitioners, waiters at Ronnie's Steak House, were examined. At that time respondent's revenue agents found that each petitioner kept either no records or inadequate records of his tip incomes for the years involved. The respondent, in the absence of such records *71 maintained by the petitioners, made an independent determination of their tip incomes, which indicated that each of the petitioners had received a greater amount of tip income in each year than he had reported. The respondent's determination was based on what has come to be known in the New York City area as "the formula." In essence, this method involved ascertaining the aggregate estimated tips received by all waiters at Ronnie's during each year, based upon applying a determined rate of tipping to Ronnie's sales for each year; and then prorating this aggregate among the several waiters at Ronnie's, based upon the amount of time that each waiter worked in each such year. The steps in the application of the formula were in substance as follows. (1) The respondent, utilizing the results of a then recently completed examination of Ronnie's own income tax returns, first determined the amount of sales of food and liquor at Ronnie's for each year, exclusive of sales taxes. These amounts were: $862,183.18 for 1957; $794,227.11 for 1958; and $677,076.21 for 1959. (2) Following consultations both with the independent accounting firm that conducted periodic audits of Ronnie's books and records, *72 and also with the management of Ronnie's, the respondent next determined that 20 percent of the liquor sales in each of the years involved, were sales made at the bar with respect to which the waiters received no tips. The accounting firm had advised the respondent's agent that Ronnie's actually did a minimum of bar business, approximating only 5 percent of the total liquor sales; but the respondent nevertheless used the 20 percent figure, in order to allow for any margin of error. The sales of liquor at the bar were then deducted from total sales as determined in step (1), to arrive at a figure for sales with respect to which tips could have been received. The total sales of liquor at Ronnie's during the years involved were: $114,807.82 for 1957; $104,597.70 for 1958; and $92,363.65 for 1959. (3) The next step involved determination of the total tips paid to the waiters at Ronnie's, in which the respondent applied a percentage figure to the sales available for tipping, as derived in step (2). Based upon his studies of tipping practices in restaurants in the New York City area which were comparable in quality to Ronnie's, the respondent initially considered fixing 15 percent as the *73 tips usually paid by customers. However, upon representations by Ronnie's management that tips at lunch averaged only 10 percent, while those at dinner and supper averaged 15 percent, the respondent's agent decided that a lesser figure than 15 percent should be applied; and he selected 12 1/2 percent. By applying 12 1/2 percent to sales available for tipping, a figure for total estimated tips was determined. (4) The respondent then determined that the waiters gave 15 percent of the tips which they had received, to the busboys who worked at Ronnie's. Accordingly, he deducted an amount equal to 15 percent of the total estimated tips as derived in step (3) from such tips, to arrive at a figure for the total tips retained by the waiters. (5) These figures, arrived at in step (4) for each year, were then related to the total figure for salaries paid by Ronnie's to its waiters for each year (which, as hereinbefore found as a fact, were not only based on uniform union rates but also were related to the time actually worked by the waiters) to arrive at a ratio between total tips retained by all waiters and total salaries paid to all waiters. The following computation shows the actual mathematical *74 implementation of the formula by the respondent in the instant cases: 1957
1958
1959
Ronnie's annual total sales of food and liquor
(exclusive of sales taxes)
$862,183.18
$794,227.11
$677,076.21
Less: Bar sales (20 percent of total liquor sales) not
subject to tips to waiters
22,961.56
20,919.54
18,472.73
Net sales of food and liquor available for tips
$839,221.62
$773,307.57
$658,603.48
Total estimated tips available to all waiters (12.5
percent of net sales)
$104,902.70
$ 96,663.37
$ 82,325.50
Less: 15 percent of tips paid by waiters to busboys
15,735.40
14,499.51
12,348.83
(a) Total tips retained by waiters
89,167.30
82,163.86
69,976.67
(b) Total annual waiters' salaries
33,207.08
30,798.23
27,634.28
Ratio of (a) to (b)
2.7 to 1
2.66 to 1
2.54 to 1
Total available tips expressed in terms of per-
centage of total salaries
270%
266%
254%
In making the determination of tip income received by each of the waiter-petitioners, respondent used a ratio of 2.5 to 1 for each year - i.e., he determined that each waiter-petitioner's tips were 2 1/2 times the amount of his reported salary. Expressed another way, respondent's determination was that tips were 250 percent of salary for each year. His reduction of the ratio actually used *75 from the greater figures which the formula had yielded, down to 2.5 to 1 (and the corresponding percentages down to 250 percent) was again, to allow for any possible margin of error. For example, in the case of a particular waiter, if he had reported regular salary from Ronnie's of $1,000 in any of the taxable years, the respondent would conclude that he had received a total of $2,500 in tips for that year. The tips actually reported for such year would then be deducted from said amount of $2,500, in determining the understatement of tip income on the return. Following the respondent's investigation of petitioners and other waiters in the New York City area, some of the petitioners began to keep records of the tips which they received. Such new records covered portions of 1961 and 1962. During said years, business at Ronnie's was falling off rather sharply, due to heavy construction going on nearby in connection with which there was considerable dynamiting. Also during 1961 and 1962, the clientele at Ronnie's changed, in that it came to be patronized by persons who were not as financially well off as its customers of earlier years. As hereinbefore found as a fact, Ronnie's finally *76 closed its doors for business on May 19, 1962. Opinion The respondent hsd determined that each of the husband-petitioners in these consolidated cases received a greater amount of tips in connection with his work at Ronnie's Steak House in New York City, than he reported in his Federal income tax return for each of the years involved. The principal issue here is whether the respondent's determination is correct. It is now well settled that tips are taxable income. See, for example, Carroll F. Schroeder, 40 T.C. 30; Dorothy L. Sutherland, 32 T.C. 862, 895; Roberts v. Commissioner, (C.A. 9) 176 F. 2d 221, affirming 10 T.C. 581. Petitioners do not contend otherwise. The nub of the dispute here is whether the respondent's use of a formula to determine the amounts of tips is correct. Section 6001 of the 1954 Code requires persons liable for income taxes to keep such records and comply with such rules and regulations as the Commissioner may prescribe. Income Tax Regs., sec. 1.6001-1(a), promulgated under the statute, require such persons to keep such records as are "sufficient to establish the amount of gross income" required to be shown on their returns. And in Barry Meneguzzo, 43 T.C. 824, 832, *77 a case involving tip income of a waiter in another high class New York restaurant, we held that while wage earners need not keep the formal records and books of account required of other taxpayers, they must nevertheless keep such records as will enable the Commissioner to determine whether the reported income has been correctly reported. In the Meneguzzo case, we further held that if a taxpayer fails to keep the required records, or the records kept do not clearly reflect income, the Commissioner is justified under section 446 of the Code, in computing income in accordance with such method as in his opinion does clearly reflect income. Dorothy L. Sutherland, supra. Turning now to the facts of the instant case, the evidence establishes that, with the exception of petitioner Anton Pollak, none of the petitioners kept any record of their incomes from tips during the taxable years involved. And as to petitioner Pollak, the evidence establishes that his records for 1957 were accidentally destroyed by his wife, and that he did not furnish respondent with his 1958 and 1959 records, either at the time of the examination of his returns or at any other time; nor did he produce his 1958 or *78 1959 records at the trial herein. Thus, in all of these consolidated cases there are no records of the petitioners' tip incomes for the years involved. In such circumstance, the respondent was, in our view, warranted in computing the petitioners' tip incomes in a manner that in his opinion clearly reflected said incomes. Respondent chose in these cases to employ a formula that is almost identical with the one he employed and this Court approved in the Meneguzzo case. [3] *79 The formula is described in some detail in our Findings of Fact. Our approval of the substantially identical formula in the Meneguzzo case renders the formula employed here to be immune to any charge that it is arbitrary. In addition, we believe here as we did in Meneguzzo, that the formula yields results that are reasonable and fair to the petitioners. Petitioners urge that the formula does not take into account the "tip-prone" sales as opposed to those sales on which tips would not be given. We think, however, that the following adjustments in working out the formula, provide ample safeguards to protect against possible errors in this regard. First of all, a generous amount - perhaps overly so - was excluded from Ronnie's total sales of food and liquor, for the principal source of no-tip sales, i.e., sales of liquor at the bar. And secondly, the use of the 12 1/2 percent tip rate (in contradistinction to the flat 15 percent rate used and approved in the Meneguzzo case) is, in our opinion, an ample cover for the occasional no-tip carryout sales for which each waiter had to write checks, as well as for those sales of food and liquor at tables where the customer left no tip. The evidence in this record does not establish that the latter type of sales was frequent. Petitioners also argue that the formula does not give recognition to the fact that some of the waiters had more favorable "stations" than others. There is very little merit to this contention. *80 In part of 1958 and throughout the year 1959, the waiters were rotated among the several stations in Ronnie's, so that each waiter had an equal opportunity to work the better stations, and, also took a share of the less desirable ones. As to 1957 and that portion of 1958 when each waiter was assigned to a permanent station, it is our belief that until the aforementioned rotation system was put into effect, there was sufficient business at Ronnie's for the waiters at all stations to have a full and fair share of the customers without the necessity of rotating. A further contention of the petitioners is that the respondent should have utilized the restaurant's sales checks for the years involved (which apparently were still available at the time when the examination of the petitioners' returns was under way) to ascertain the sales made by each waiter and to determine the tips actually received by each waiter in the charge account and credit card transactions. The respondent could have done this, it is true; but he was, in our opinion, not required to take this approach. In Meneguzzo, we held that the Commissioner is entitled to use any method that, in his opinion, clearly reflects income, *81 in order to determine whether such income has been properly reported. This, we believe, clothes the respondent with a broad discretion. We do believe that he did not abuse his discretion by the use of the formula approach that yielded what to us seem reasonable results, rather than by going through at least hundreds and probably thousands of individual sales checks to determine tip incomes of these petitioners on a waiter-by-waiter basis. Our confidence in the substantial accuracy of the results obtained through use of the formula method here employed, persuades us that no significantly different results would have been obtained by examining the individual sales checks. Finally, the petitioners urge that the ratio of tips to wages and the percentage of tips to sales as revealed in certain records which petitioners Marino and Pollak maintained for subsequent periods in 1961 and 1962, should be used to determine tip incomes for the earlier taxable years 1957 through 1959, rather than the somewhat greater ratios and percentages yielded by the respondent's formula. However, in our judgment, the respondent's method, predicated as it is upon data for the particular taxable years involved, *82 is more persuasive evidence of the true tip incomes of the petitioners for such years, than is the fragmentary evidence of two of the waiters for subsequent years when Ronnie's business was in a state of decline that ultimately terminated in the closing of the restaurant, and when Ronnie's customers had become persons who were less well off financially. In the light of the foregoing we are impelled to conclude that the petitioners have not borne their burden of establishing error in the respondent's determination of their tip incomes. We decide this issue for the respondent. Barry Meneguzzo, supra.See also Anson v. Commissioner, (C.A. 10) 328 F. 2d 703, and Mendelson v. Commissioner, (C.A. 7) 305 F. 2d 519, certiorari denied 371 U.S. 877 - each case affirming a Memorandum Opinion of this Court - where the use of a slightly different formula was approved in determining tip incomes of the waiter-taxpayers there involved. The second issue in all the cases at bar concerns the additions to tax for negligence, imposed by the respondent under section 6653(a). With respect to all petitioners except Anton Pollak (Docket No. 1037-62), we approve the imposition of the additions to tax, *83 in reliance upon the Meneguzzo case, wherein we said (43 T.C., p. 836): Petitioner understated his income in each of the taxable years. In view of his failure to keep adequate records, petitioner was extremely negligent; since this negligence resulted in an underpayment, the additions to tax determined by respondent under section 6653(a) n9 must be sustained. Carroll F. Schroeder, supra 40 T.C. 30]. See Mendelson v. Commissioner, supra 305 F. 2d 519]. [Footnote omitted.] As to petitioner Pollak, the evidence establishes to our satisfaction that he did maintain records of his tip income throughout the time of his employment at Ronnie's. His records for 1957 and prior years were accidentally destroyed by his wife early in 1958. We are not certain of the reason why he did not furnish his records for 1958 and 1959; but it appears that Pollak, being a man of seemingly limited educational attainments, was not certain as to exactly when his records should have been brought forward. At any rate, we do not believe that it would be proper to penalize him for negligence, grounded on a failure to keep records. We disapprove the additions to tax imposed against Pollak. Decisions will be entered *84 for the respondent in all Docket Nos. except 1037-62 and 1408-62. Decisions will be entered under Rule 50 in Docket Nos. 1037-62 and 1408-62. Footnotes
1. The following cases are consolidated herewith: Emil and Elsie Lowy, Docket No. 95263; Anton and Goldie Pollak, Docket No. 1037-62; William Hoffman, Docket No. 1111-62; Ben and Dorothy Marcus, Docket No. 1263-62; Costas Xikis, and Costas Xikis and Kiki Xikis, Docket No. 1284-62; Emil and Marie Holzer, Docket No. 1292-62; George and Greta Sahlin, Docket No. 1407-62; Ralph and Filomena Marino, Docket No. 1408-62; Frank and Ruth Ritter, Docket No. 1460-62; Estate of Michael Reismann, Deceased, Helen Reismann, Administratrix, Docket No. 1554-62; Leo Lepold, Docket No. 1685-62; Nicholas Delegianis and Evangeline Delegianis, Docket No. 1687-62; Louis Rannou, Docket No. 1713-62; Raymond Desserre (Individually) and Raymond and Lydia Desserre (Jointly), Docket No. 2224-62; Allen Marcus, Docket No. 3628-62.↩
2. The taxable years involved in all the cases except Lepold (Docket No. 1685-62) and Delegianis (Docket No. 1687-62) are the 3 calendar years 1957 through 1959. However, in the Lepold and Delegianis cases, only the 2 years 1957 and 1958 are involved.↩
3. The only distinctions between the two formulas that we can discern are: (1) With respect to the amount of liquor sales excluded as representing bar sales, in Meneguzzo the respondent excluded 25 percent, while in the instant cases he excluded 20 percent; and (2) with respect to the rate of tip determined to have been paid to waiters by customers, in Meneguzzo the rate was 15 percent, while in the present cases, the rate was a lower one of 12 1/2 percent.